**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **LOUIS D'ANTONIO, ET AL.,**<br><br>　　Plaintiffs,<br><br>　　vs.<br><br>**MONTEREY BAY MILITARY HOUSING, LLC AND MICHAELS MANAGEMENT SERVICES, INC.,**<br><br>　　Defendants. | Case No. 4:21-CV-2607-YGR<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**<br><br>Re: Dkt. No. 49 |
| **STEVE BELL, ET AL.,**<br><br>　　Plaintiffs,<br><br>　　vs.<br><br>**MONTEREY BAY MILITARY HOUSING, LLC AND MICHAELS MANAGEMENT SERVICES, INC.,**<br><br>　　Defendant. | Case No. 4:21-CV-4535-YGR<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>Re: Dkt. No. 15 |

Plaintiffs, three military families, bring these related actions against defendants Monterey Bay Military Housing, LLC ("MBMH") and Michaels Management Services, Inc. ("Michaels") in connection with allegedly substandard private military housing provided and/or maintained by defendants. The D'Antonio's and Keller's have filed their third amended complaint (Dkt. No. 47 in No. 21-CV-2607-YGR), and the Bell's have filed their first amended complaint (Dkt. No. 13 in No. 21-CV-4535-YGR). Currently pending are defendants' motions to dismiss both actions. (Dkt. No. 49 in No. 21-CV-2607-YGR, Dkt. No. 15 in No. 21-CV-4535-YGR.) Because the operative complaints are identical (except for the family-specific allegations), the motions to dismiss are "essentially the same." (Motion to Dismiss the Bell FAC, at 2 n.2.) Indeed, the Court has not identified any meaningful difference in the motions and therefore disposes of both motions in this order.

Having carefully considered the pleadings and the briefing on the motions, and for the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the motion. Specifically, the motion is **GRANTED** as to the claim for breach of the implied warranty of good workmanship but otherwise **DENIED** as to all other claims.

## I.  BACKGROUND

Plaintiffs are three military service members and their families, the D'Antonio's, the Keller's, and the Bell's, who leased housing at The Parks at Monterey Bay. Plaintiffs allege that "MBMH is the landlord with whom [they] entered into leases" and that Michaels "is the management company that manages the properties." (D'Antonio/Keller TAC ¶¶ 9–10, Bell FAC ¶¶ 9–10.) Plaintiffs do not further distinguish between the two defendants in the TAC, noting that "[t]he personnel with whom [p]laintiffs dealt generally identified themselves as associated with The Parks at Monterey Bay. Whether these personnel were actually employees of MBMH or [Michaels] is unclear to [p]laintiffs." (D'Antonio/Keller TAC ¶ 38 n.5.)

The federal government allegedly contracts with defendants "for the design, development, management, operation, maintenance, renovation and rehabilitation of housing suits for military personnel and their families at [the Parks]." (D'Antonio/Keller TAC ¶ 55; Bell FAC ¶ 50.) These government contracts flow from the 1996 Military Housing Privatization Initiative ("MHPI"), through which Congress sought to "improve the quality of housing conditions for active-duty military personnel." (D'Antonio/Keller TAC ¶ 17 (citing 10 U.S.C. § 2871, *et seq.* (1996)); Bell FAC ¶ 17 (citing same).) The legislation provided a way to maximize use of limited appropriated funds, land, and existing facilities to encourage private sector investment for the benefit of servicemembers. (D'Antonio/Keller TAC ¶ 17; Bell FAC ¶ 17.) Servicemembers who lease housing on a particular military base are required to pay the full amount of their basic allowance for housing and therefore are without leverage against companies like defendants when problems arise with their homes. (D'Antonio/Keller TAC ¶¶ 21–22; Bell FAC ¶¶ 21–22.) After media "reports described how military families encounter high hurdles to resolving disputes in a system that grants vast power to private landlords who manage base housing across the United States" (D'Antonio/Keller TAC ¶ 24; Bell FAC ¶ 24), Congress began to investigate what was purportedly a pervasive problem.

2

(D'Antonio/Keller TAC ¶¶ 25–33; Bell TAC ¶¶ 25–33.)  The Court now recites the allegations specific to each plaintiff-family.

**The D'Antonio's**:  In June 2018, the D'Antonio's moved into the house at 8027 Shubrick Road.  (D'Antonio/Keller TAC ¶ 37.)  Defendants' leasing representative Brook White informed the D'Antonio's "that the house would be safe for occupancy by the time the family moved in." (*Id.* ¶ 38.)  "However, shortly after moving into the house, the family noticed a smell emanating from their daughter's bedroom closet." (*Id.*)  Defendants' representatives, "including a maintenance man named Josh, a maintenance supervisor named Ernie, a facility director named Eric, and a facility director named Kathy Barry," "told the family that the home was fixed and safe and that they should not worry." (*Id.*)  Nevertheless, "the closet smell persisted, [and] the family noticed that mold had begun to grow though the floors and on the tub in the bathroom." (*Id.*)

"At the end of their first year in the house, the family had suffered through at least three failed attempts by three different contractors for mold remediation – each time being told by [defendants] that the issue had been addressed, only for it to resurface and have to be addressed again," including efforts made in May 2019.  (*Id.* ¶ 39.)  "[I]n early June 2019, the family was moved to a temporary house," which Ms. Barry represented had never had any mold issues.  (*Id.* ¶ 40.)  However, "[u]pon moving in, the family discovered pests and hair in the bedsheets, a shower without hot water, and signs that the house had undergone mold remediation work.  The family discovered mold growth in the temporary house and on June 15, 2019, the [defendants] sent the mold remediation report to the family, confirming that mold work had been completed contrary to [their] representations.  This prompted the family to move to their third address within 15 months." (*Id.*)  As a result of defendants' actions, the D'Antonio's allege that they experienced runny noses, itchy eyes, chronic congestion, dizzy spells, shortness of breath, behavioral problems, and memory lapses, among other health issues.  (*Id.* ¶ 41.)  The family also suffered property damage and mental distress.  (*Id.* ¶¶ 42–43.)

**The Keller's**:  In May 2017, the Keller's moved into the house at 101 Moreell Circle.  (*Id.* ¶ 44.)  Defendants' leasing representative (an unidentified female) informed the Keller's that the house "was free of known defects and safe to live in." (*Id.*)  However, shortly after moving in, the Keller's

3

observed discoloration on the trim, a sewage spill in the front yard backing up into their bathrooms, and mold growth in the same. (*Id.*) In each instance, maintenance workers, "who wore apparel identifying themselves as representatives of The Parks at Monterey Bay," purported to address the problems, "represent[ing] that the repairs were made properly and would resolve the reported issue[s]." (*Id.*) However, because the problems persisted, in February 2018, defendants "displaced the family from the house so that they could perform mold remediation work," which the Keller's allege "was performed far below the applicable standard of care." (*Id.* ¶ 45.) "To make matters worse, the temporary house into which the family had been moved was infested with mold and insects." (*Id.*) The Keller's also complain of cursory repairs of the continuing discoloration issue in December 2018, defendants' refusal to perform air quality testing in February 2019, and containment failures during the active mold remediation in February and March 2019 by defendants' outside contractor Disaster Kleenup Specialists. (*Id.* ¶¶ 46–48.) As a result, the Keller's allege that they suffered a number of health effects, including persistent coughs, sore throats, shortness of breath, sleeping problems, rashes, bladder control issues, and unexplained tantrums. (*Id.* ¶¶ 49–50.) The family also suffered property damage and mental distress. (*Id.* ¶¶ 51–52.)

**The Bell's**: In June 2018, the Bell's moved into the house at 8029 Shubrick Road, which defendants represented at the time was "safe" and "habitable." (Bell FAC ¶ 37.)[1] However, defendants "never informed [the Bell's] of moisture issues or previous mold remediation efforts." (*Id.*) Shortly after moving in, the family began to experience a number of health issues, including difficulty regulating body temperature, rashes, dry hands, migraines, shortness of breath, poor focus, decreased stamina, metallic taste, and stunted growth. (*Id.* ¶¶ 38–39.) In May 2019, defendants contracted with CleanTec to inspect the home after Mrs. Bell requested maintenance of their dishwasher. (*Id.* ¶ 41.) Just after the CleanTec visit, defendants informed the family that they would have to evacuate the home. (*Id.*) Soon thereafter, the Bell's were informed that "mold was found on the kitchen cabinets, [in] the drywall insulation, under the flooring, along the studs, and throughout the master bedroom." (*Id.* ¶ 42.) It was not until November 2019, "after the family had been living

---

[1] Paragraph 39 of the Bell FAC states the address as 8019 Shubrick Road, whereas all other references state 8029 Shubrick Road. The Court assumes this is a clerical error.

4

out of a hotel for several months," when "Lt. Comm. Bell went into the home and noticed evidence of previous mold remediation efforts." (*Id.* ¶ 45.) Defendants, through a maintenance supervisor by the name of Eric, "[e]ventually admitted" to the Bell's that "the house had experienced moisture problems ever since it was constructed in 2007," and that "a leak developed shortly after construction of the home that was never properly addressed or repaired, which in turn led to pervasive mold problems and structural rotting." (*Id.*) The Bell's also complain about failures regarding air quality testing conducted in May and June 2019 and failures with containment during CleanTec's mold remediation work in June 2019. (*Id.* ¶¶ 42–43.) In addition to the alleged health issues, the family also suffered property damage and mental distress. (*Id.* ¶¶ 46–47.)

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), an action may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). The complaint must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When considering a motion to dismiss, a court must accept all material allegations in the complaint as true and construe them in the light most favorable to plaintiff. *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

## III. ANALYSIS

As an initial matter, defendants renew their challenge to plaintiffs' group pleading, submitting that the operative complaints "fail[ ] to address the Court's clear direction that [p]laintiffs separate the allegations by specific [d]efendant instead of grouping all alleged acts and omissions together as the acts and omissions of the 'landlord companies.'" (Mtn. at 1.)

A complaint generally must meet the pleading requirements of Rule 8(a)(2) and must have "a short and plain statement of the claim showing that the pleader is entitled to relief" so that defendants can have "fair notice" of the claim. Fed. R. Civ. P. 8(a)(2); *Twombly*, 550 U.S. at 555. However, a party alleging fraud must meet the heightened pleading standard of Rule 9(b); *Bly-Magee*

*v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). Under Rule 9(b), a plaintiff must make allegations "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F. 2d 727, 731 (9th Cir. 1985). These claims should allege "an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal citations omitted).

The Court stated at the hearing on defendants' motion to dismiss the D'Antonio's and Keller's second amended complaint that it had not sufficiently distinguished between the various defendants, which, at the time, included two other entities and none of whose respective involvement was alleged with any particularity. However, the operative complaints name only two defendants (MBMB and Michaels), not four, and identifies them as landlord and property manager. Plaintiffs also provide names of defendants' representatives and approximate dates of their interactions where possible, noting that these individuals generally identified themselves as associated with The Parks, rather than with either defendant. Thus, it would be unreasonable to expect plaintiffs to identify with which defendant each of the representatives associated without the benefit of discovery. While the operative complaints do not further distinguish between the two defendants, instead referring to them collectively as "Landlord Companies," the Court now finds that, for purposes of both Rules 8 and 9, the pleadings sufficiently put defendants on notice of which allegations they must defend. Defendants' argument that they are "prejudiced by these deficiencies because the TAC does not provide each of them fair notice of the specific allegations charged against them" is not well taken.[2] Accordingly, the motions to dismiss on this ground is **DENIED**.

//

---

[2] Defendants also contest plaintiffs' reliance on the joint enterprise theory on the ground that California law does not recognize this theory in the negligence context. Plaintiffs allege more than a claim for negligence. Accordingly, this argument does not persuade. Nor does defendants' cursory challenge to the sufficiency of plaintiffs' allegations of a joint enterprise.

### 1. BREACH OF CONTRACT (FIRST CAUSE OF ACTION)[3]

Defendants move to dismiss the breach of contract cause of action for failing to allege a breached provision of the lease agreement other than that of the implied warranty of habitability for which plaintiffs assert a separate cause of action. Because plaintiffs allege no other provision in the agreement that was breached, the two causes of action appear largely duplicative.[4] Nevertheless, plaintiffs plead the cause of action for breach of the implied warranty of habitability in the alternative, which is permissible at this stage. The motions to dismiss the first cause of action is therefore **DENIED**.

### 2. COMMON LAW FRAUD (SECOND CAUSE OF ACTION)

Defendants move to dismiss the fraud cause of action for failing to allege what the alleged misrepresentations were, who made them, what was false about them, and why they were false. Under Rule 9(b), a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted). Here, plaintiffs allege that defendants' representatives, at the time each of the families signed their leases and moved into their respective homes in the Parks, represented that the houses were safe to live in when they were not. (D'Antonio TAC ¶¶ 38, 44; Bell FAC ¶¶ 37–40.) In addition, plaintiffs allege that defendants' representatives, at the time when repairs were made in response to reported problems with plaintiffs' housing, represented that the issues were resolved when they were not. (D'Antonio TAC ¶¶ 39–40, 45–48; Bell FAC ¶ 41–45.) The Court finds that these allegations suffice for purposes of Rule 9(b). Accordingly, the motions to dismiss the second cause of action is **DENIED**.

//
//

---

[3] The caption page of the complaints is not consistent with the allegations, which plead the contract claim first, followed by the fraud claim. The Court will follow defendants' lead and address the claims in the order they are alleged in the pleadings, rather than in the order listed on the caption page.

[4] While the D'Antonio's and Kellers' purported leases appear to be part of the record (Dkt. Nos. 28-3, 28-4), the Court will not scour the agreements for any other breached provisions.

### 3. NEGLIGENCE, NEGLIGENT MISREPRESENTATION, AND GROSS NEGLIGENCE (THIRD CAUSE OF ACTION)

Plaintiffs assert three distinct causes of action, negligence, negligent misrepresentation, and gross negligence, under a single heading. The Court considers each in turn. First, defendants move to dismiss the ordinance negligence cause of action for failing to distinguish the allegations based on each defendant. Because the Court has rejected this challenge at the outset, the motions to dismiss this cause of action is **DENIED**. Second, defendants move to dismiss the negligence misrepresentation claim for failing to allege who made the alleged misrepresentations, what the alleged misrepresentations were, what was false about them, and why they were false. Because the Court has rejected this challenge with respect to the fraud cause of action, the motions to dismiss the negligence misrepresentation cause of action is **DENIED**.

Third, defendants move to dismiss the gross negligence cause of action for failing to cite a statutory basis for the claim and for failing to sufficiently facts that rise to the level of gross negligence. With respect to the first challenge, although the California Supreme Court has stated that "California does not recognize a distinct cause of action for 'gross negligence' independent of a statutory basis," *Saenz v. Whitewater Voyages, Inc.*, 226 Cal. App. 3d 758, 766 n.9 (1990), it subsequently described this language as "offhand dicta." *City of Santa Barbara v. Superior Court*, 41 Cal.4th 747, 780 (2007); *see also Hass v. RhodyCo Productions*, 26 Cal. App. 5th 11, 32 (2018) ("In *Santa Barbara*, the Supreme Court did not definitively resolve this issue . . . ."); Judicial Council of California Civil Jury Instruction, 425 "Gross Negligence" Explained ("This instruction may also be given if case law has created a distinction between gross and ordinary negligence."). Therefore, the Court is not persuaded that plaintiffs' failure to plead a statutory basis for gross negligence dooms their claim.

With respect to the challenge to the sufficiency of plaintiffs' allegations, "[g]ross negligence is pleaded by alleging the traditional elements of negligence: duty, breach, causation, and damages." *Rosencrans v. Dover Images, Ltd.*, 192 Cal. App. 4th 1072, 1082 (2011). However, to state a claim for gross negligence, the plaintiff must allege "extreme conduct" by the defendant. *Id.* The alleged conduct must rise to the level of "either a want of even scant care or an extreme departure from the ordinary standard of conduct." *Id.* (quoting *Santa Barbara*, 41 Cal.4th at

8

754) (internal quotation marks omitted).  At this juncture, the Court finds that the allegations that defendants provided plaintiffs with housing teeming with pervasive health and safety hazards could plausibly support a finding of gross negligence.  It could constitute an "extreme departure from the ordinary standard of conduct" if defendants consciously provided military servicemembers with homes that were neither safe nor sanitary.  Indeed, some of the plaintiffs were allegedly evacuated from toxic environments and placed into temporary housing with more of the same problems. *See Jimenez v. 24 Hour Fitness USA, Inc.*, 237 Cal. App. 4th 546, 555 (2015) (defining gross negligence and noting that "whether conduct constitutes gross negligence is generally a question of fact, depending on the nature of the act and the surrounding circumstances shown by the evidence"). Nevertheless, "California does not recognize a distinct common law cause of action for gross negligence *apart from negligence*." *Id.* at 552 n.3 (2015) (citations omitted) (emphasis supplied); *see also Anderson v. Fitness Int'l, LLC*, 4 Cal. App. 5th 867, 881 (2016) (gross negligence differs from ordinary negligence only in degree, not in kind).  Here, plaintiffs already allege a cause of action for ordinary negligence.  Thus, plaintiffs may pursue a cause of action for gross negligence, but *only in the alternative*, as they cannot recover under both theories.  Accordingly, to that extent, the motions to dismiss the gross negligence cause of action is **DENIED**.

**4. BREACH OF WARRANTY OF HABITABILITY (FOURTH CAUSE OF ACTION)**

Defendants do not separately move to dismiss the breach of implied warranty of habitability cause of action.

**5. BREACH OF WARRANTY OF GOOD WORKMANSHIP (FIFTH CAUSE OF ACTION)**

Defendants move to dismiss the breach of implied warranty of good workmanship cause of action on four grounds: (i) this cause of action sounds in contract; (ii) no case has extended the implied warranty of good workmanship to the landlord-tenant relationship; (iii) plaintiffs fail to identify what alleged repairs fell below standard, how so, and which defendant or outside contractor performed the alleged repairs; and (iv) plaintiffs lack privity with the vendors contracted by defendants.  The Court considers the second asserted ground as it is dispositive here.  Neither the parties nor the Court have located any California authority recognizing an implied warranty of workmanship in the context of a lease agreement.  While California has recognized this warranty in

the context of construction contracts, *see Aced v. Hobbs-Sesack Plumbing Co.*, 55 Cal.2d 573, 577 (1961) ("[C]onstruction contracts . . . give rise to an implied warranty that the product will be fit for its intended use both as to workmanship and materials."), plaintiffs do not allege that defendants assigned to plaintiffs any such warranties made by their contractors.  Because the Court cannot conclude that any implicit warranty against defects of workmanship ran to plaintiffs, the motions to dismiss the fifth cause of action is **GRANTED**.

### 6.   THIRD-PARTY BENEFICIARY OF CONTRACT (SIXTH CAUSE OF ACTION)

Defendants move to dismiss the third-party beneficiary of contract cause of action for failing to identify: (i) the contracts at issue, the signatories, the governing law, and the contract's duration; (ii) specific contractual language demonstrating that plaintiffs are intended beneficiaries; and (iii) specific contractual provisions that were breached by defendants.

Plaintiffs allege that they are third-party beneficiaries of contracts awarded to defendants by the federal government.  Federal law controls the interpretation of a contract to which the United States is a party.  *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.2d 1206, 1210 (9th Cir. 2000).  To benefit under a contract, a third-party beneficiary must first establish that he is an intended beneficiary.  *Id.*  However, "[p]arties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary." *Id.* at 1211.

Plaintiffs allege, on information and belief, that the government contracts included an agreement by defendants to provide and maintain safe and habitable housing for servicemembers. (D'Antontio/Keller TAC ¶¶ 92–94; Bell FAC ¶¶ 86–88.)  Plaintiffs further allege that defendants breached their contractual obligations by failing to do so.  (D'Antonio/Keller TAC ¶¶ 95–98; Bell FAC ¶¶ 89–92.)  Although plaintiffs do not allege specific contractual language demonstrating their status as intended third-party beneficiaries, there is no indication that plaintiffs have access to the contracts at issue, and "it is the very purpose of discovery to establish the contacts of [those] agreement[s]." *See Paulsen v. CNF Inc.*, 559 F.3d 1061, 1079 n.19 (9th Cir. 2009).  In *Paulsen*, the plaintiffs alleged that they were the intended beneficiaries of the actuarial services rendered to their employee.  *Id.*  However, the agreement between the employer and the actuarial firm was not in the

record. *Id.* The Ninth Circuit reversed the district court's dismissal with prejudice of the plaintiffs' claim against the firm, holding that the plaintiffs had pled sufficient facts establishing its third-party beneficiary status to survive a motion to dismiss. *Id.* The court rejected the defendant's argument that plaintiffs had pled insufficient facts to show that the agreement was for their benefit. *Id.* n.19 ("This argument is unpersuasive given the procedural posture of this case. No evidence in the record suggests that the Employees had access to the [ ] engagement agreement or related documents . . . .").[5]

Viewing the allegations in the light most favorable to plaintiffs, the Court cannot conclude as a matter of law that plaintiffs were not third-party beneficiaries to the alleged government contracts, and the allegations are plausible. *See, e.g.*, *Addi v. Corvias Management-Army, LLC*, No. 19-CV-3253 (ELH), 2020 WL 5076170, at *30 (D. Md. Aug. 27, 2020) ("At this stage, whether plaintiffs are third-party beneficiaries of the Ground Lease and the [property management agreement] turns, at least in part, on the intent of the parties in the formation of those contracts. That is a factual dispute, and is not appropriate for adjudication at this stage."). The motions to dismiss the sixth cause of action is therefore **DENIED**.

### 7. NUISANCE (SEVENTH CAUSE OF ACTION)

Defendants move to dismiss the nuisance cause of action for failing to "identify what specific conduct or condition they allege constitutes a nuisance, or even . . . the specific property where such conduct allegedly occurred or condition existed." (Mtn. at 13.) In light of the allegations detailing the substandard housing conditions at each of the families' homes at the Parks (D'Antonio/Keller TAC ¶¶ 37–52, Bell FAC ¶¶ 37–47), this argument is not well taken. The motions to dismiss the seventh cause of action is **DENIED**.

### IV. CONCLUSION

For the foregoing reasons, the motions to dismiss are **GRANTED IN PART AND DENIED IN PART**. Specifically, the cause of action for breach of the implied warranty of good workmanship is

---

[5] Although the record contains a purported ground lease executed by the U.S. Army, which appears to generally disclaim third-party claims, it is otherwise entirely redacted. (Dkt. No. 28-5.) The Court declines to speculate as to its contents.

**DISMISSED**. Within **twenty-one (21) days** of this order, defendants shall file their response to the complaints.

It is **FURTHER ORDERED** that the parties shall meet and confer and advise the Court whether the two actions should be consolidated and, if so, whether the later-filed action may be administratively closed. The Court hereby **SETS** a compliance deadline for **Friday, December 17, 2021**. **Five (5) business days** prior to the compliance deadline, the parties shall file a joint statement regarding their respective positions on consolidation. If compliance is complete, the deadline shall be taken off calendar.

**IT IS SO ORDERED.**

Dated: **December 6, 2021**

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**